██████████████████████████████████

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | |
|---|---|
| **EMERGING AUTOMOTIVE LLC,** | |
| *Plaintiff,* | |
| v. | **Civil Action No. 2:23-cv-0437-JRG** |
| **KIA CORPORATION, ET AL.,** | (Lead Case) |
| *Defendants.* | |
| **EMERGING AUTOMOTIVE LLC,** | |
| *Plaintiff,* | |
| v. | **Civil Action No. 2:23-cv-0434-JRG** |
| **TOYOTA MOTOR CORP., ET AL.** | (Member Case) |
| *Defendants.* | ███████████████ |

**DEFENDANTS' MOTION TO EXCLUDE THE OPINIONS AND TESTIMONY
OF ROY WEINSTEIN**

███████████████████████

## <u>TABLE OF CONTENTS</u>

I.     INTRODUCTION ......................................................................................... 1

    A.    Mr. Weinstein's Opinion Fails to Apportion and Relies on an Improper "Proxy" .................................................................................................... 1

    B.    Mr. Weinstein's "Profit Splits" Are Not Tethered to the Facts of This Case ......... 3

II.    LEGAL STANDARD .................................................................................... 4

III.   ARGUMENT ................................................................................................ 5

    A.    Mr. Weinstein Fails to Apportion His Royalty Base to the Accused Aspects of Remote Connect, Digital Key, or User Profile ...................... 5

        1.    E-Key Patents ('026, '659, '188 Patents) .................................... 5

        2.    User Profile Patent ('268 Patent) ................................................ 7

    B.    Mr. Weinstein Fails to Perform the Necessary Technological and Economic Comparability Analysis for His Remote Connect and User Profile Proxies ........................................................................................ 8

    C.    Mr. Weinstein's Profit Split Models Are Deficient ........................... 10

        1.    Mr. Weinstein's Profit Splits Are Untethered From His Analysis of the *Georgia-Pacific* Factors .................................... 11

        2.    70/30 "App Store" Profit Split ................................................... 12

        3.    84/16 "Dealer Fee" Profit Split .................................................. 13

        4.    84.5/15.5 (User Profile) or 87.9/12.1 (E-Key) "ROIC" Profit Split ......... 14

IV.   CONCLUSION ........................................................................................... 15

████████████████████████████

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Bayer HealthCare LLC v. Baxalta Inc.*,
  2019 WL 330149 (D. Del. Jan. 25, 2019)...............................................................................14

*Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*,
  No. 2:14-CV-911-JRG, 2016 WL 4440255 (E.D. Tex. Aug. 23, 2016), *aff'd*,
  880 F.3d 1356 (Fed. Cir. 2018)..............................................................................4, 8, 9, 10

*Droplets Inc. v. Yahoo! Inc.*,
  No. 12-cv-03733-JST, 2022 WL 2670163 (N.D. Cal. Jan. 12, 2022) ..............................11, 12

*Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prods. Grp.*,
  LLC, 879 F.3d 1332 (Fed. Cir. 2018) .................................................................................4, 12

*Fundamental Innovation Sys. Int'l LLC v. Anker Innovations, Ltd.*,
  No. 21-339-RGA, slip op. (D. Del. Feb. 11, 2025) ...............................................................15

*MLC Intell. Prop., LLC v. Micron Tech., Inc.*,
  10 F.4th 1358 (Fed. Cir. 2021) ................................................................................................4

*NexStep, Inc. v. Comcast Cable Commc'ns, LLC*,
  No. CV 19-1031-RGA, 2021 WL 4207442 (D. Del. Sept. 16, 2021) ....................................14

*OPTi, Inc. v. Apple, Inc.*,
  No. 2:07-CV-21, 2009 WL 10677791 (E.D. Tex. Apr. 3, 2009)...............................................3

*Robocast, Inc. v. Microsoft Corp.*,
  No. CV 10-1055-RGA, 2014 WL 350062 (D. Del. Jan. 29, 2014) ........................................15

*Saint Lawrence Commc'ns LLC v. ZTE Corp.*,
  No. 2:15-CV-349-JRG, 2017 WL 679623 (E.D. Tex. Feb. 21, 2017) .....................................4

*Sonos, Inc. v. Google LLC*,
  No. C 20-06754 WHA, 2023 WL 3933071 (N.D. Cal. June 9, 2023)....................................13

*Suffolk Technologies LLC v. Aol Inc.*,
  No. 1:12-cv-625, 2013 WL 12156056 (E.D. Va. Apr. 12, 2013) ...........................................11

*Syneron Med. Ltd. v. Invasix, Inc.*,
  No. 8:16-CV-00143-DOC-KES, 2018 WL 4696969 (C.D. Cal. Aug. 27, 2018).....................4

*Uniloc USA, Inc. v. Microsoft Corp.*,
  632 F.3d 1292 (Fed. Cir. 2011).................................................................................... *passim*

*Versata Software Inc. v. SAP Am. Inc.*,
    No. 2:07-CV-153 CE, 2011 WL 4017939 (E.D. Tex. Sept. 9, 2011)..................................3, 15

*VirnetX, Inc. v. Cisco Sys. Inc.*,
    767 F.3d 1308 (Fed. Cir. 2014)........................................................................ *passim*

**Rules**

Fed. R. Evid. 702 ...........................................................................................................4

Defendants Toyota Motor Corp., Toyota Motor North America, Inc., and Toyota Motor Sales, U.S.A., Inc. (together, "Toyota") respectfully move to exclude the opinions of Roy Weinstein, the damages expert retained by Plaintiff Emerging Automotive, LLC ("EA"). Mr. Weinstein's opinions are unreliable and inadmissible because they rely on flawed methodology and fail to conform to controlling Federal Circuit precedent requiring experts to (1) apportion the royalty base to exclude non-patented functionality, (2) select a technologically and economically comparable proxy for the accused technology, and (3) tether any "profit splitting" theories to the specific facts of the particular case.

## I.    INTRODUCTION

### A.    Mr. Weinstein's Opinion Fails to Apportion and Relies on an Improper "Proxy"

EA and its damages expert, Roy Weinstein, seek to present the jury with inflated damages calculations that violate Federal Circuit apportionment law and are untethered to the facts of this case. Weinstein employs a "proxy" approach to arrive at a reasonable royalty that Toyota would purportedly have agreed to pay EA for rights to practice the four Asserted Patents.[1] EA accuses Toyota's Remote Connect feature of infringing its three E-Key Patents, and Toyota's User Profile feature of infringing its User Profile Patent. Ex. A ("Weinstein Report"), ¶23. For the E-Key patents, Mr. Weinstein bases his royalty on the full value of both (1) the Digital Key of Remote Connect and (2) proxy "traditional key fobs" as his royalty base. Weinstein Report, ¶¶23, 84-93. For the User Profile Patent, Mr. Weinstein bases his royalty on the full value of a proxy "memory seat switch." Weinstein Report, ¶¶94-98; *see also* Ex. B ("Weinstein Supplemental Report,"), ¶¶9-10 (listing updated numbers for the User Profile Patent based on updated sales data).

---

[1] The Asserted Patents are U.S. Patent Nos. 10,407,026, ("the '026 Patent,"), 11,738,659, ("the '659 Patent,"), 9,365,188, ("the '188 Patent,") (collectively, the "E-Key Patents") and 9,171,268, ("the '268 Patent," or "User Profile Patent.").

██████████████████████████████████████████████

However, Mr. Weinstein fails to conduct ***any*** apportionment between the value of the infringing and non-infringing aspects of either the accused products or their purported proxies. This leads to Mr. Weinstein reaching damages numbers untethered from reality for the reasonable royalty Toyota would pay for rights to the Asserted Patents. As one example, Mr. Weinstein opines that ████████████████████████████ to license the E-Key Patents from September 2017 through July 2025. *See* Weinstein Report at Exhibit 11. Remote Connect subscriptions include non-accused functionalities such as music streaming, yet ████████████████████████ ████████████████████████████████████████████████ ████████████ Weinstein Report, ¶118; Ex. C ("Schoettelkotte Report"), ¶¶76-77.[2]

Rather than apportion his royalty ***down*** to the functions of Remote Connect that are actually alleged to infringe, Mr. Weinstein cranks ***up*** his royalty rate by selecting a more expensive set of traditional key fobs as proxies for Remote Connect and one of the features of Remote Connect on some vehicles, Digital Key. Weinstein Report at Exhibit 11. Mr. Weinstein opines that a prior art "traditional key fob" is a "conservative" proxy for Remote Connect, then multiplies the entire, unapportioned price of a traditional key fob by the volume of Remote Connect "capable" vehicles by one of his three proposed profit split models to come up with a damages number. *See* Weinstein Report at Exhibits 7, 10; *see, e.g.*, Ex. D ("Weinstein Dep. Tr. (Rough)") (90:22-91:12). In doing so, Mr. Weinstein fails to perform any meaningful apportionment analysis to the allegedly patented features of either Remote Connect or a traditional key fob. Mr. Weinstein's analysis is likewise

---

[2] For example, the $15 or $25/month packages that customers pay to use Remote Connect *also* provide access to music streaming services in the "Music Lover" package, or live navigation services in the "Go Anywhere" package, or both in the Premium package. Ex. E "Andrews Report"), ¶46; Ex. F ("Mito Depo. Tr."), 57:12-58:7. All three include Remote Connect, which includes non-accused functionalities like the ability to determine tire pressure, or set the hazard lights, or receive check engine warning alerts. Andrews Report, ¶47.

deficient for the User Profile Patent, which he analogizes to a seat memory switch proxy without the requisite technical/economic comparability analysis or apportionment. Weinstein Report, ¶¶94-98. For both the E-Key Patents and the User Profile Patent, Mr. Weinstein's royalty base calculations are wholly untethered to the facts of this case and should be excluded. *See, e.g.*, *VirnetX, Inc. v. Cisco Sys. Inc.*, 767 F.3d 1308, 1329 (Fed. Cir. 2014) (vacating a damages verdict where Mr. Weinstein failed to apportion the value between the patented features and "the vast number of non-patented features contained in the accused products[.]"); *OPTi, Inc. v. Apple, Inc.*, No. 2:07-CV-21, 2009 WL 10677791, at *2 (E.D. Tex. Apr. 3, 2009) (granting motion to exclude in part where the facts did not support Mr. Weinstein's application of the entire market value rule); *Versata Software Inc. v. SAP Am. Inc.*, No. 2:07-CV-153 CE, 2011 WL 4017939 at *4 (E.D. Tex. Sept. 9, 2011) (excluding Mr. Weinstein's testimony because his reasonable royalty rate was "nothing more than an unsupported percentage of SAP's total revenue.").

### B.    Mr. Weinstein's "Profit Splits" Are Not Tethered to the Facts of This Case

Mr. Weinstein's reasonable royalty opinions also rely on profit-splitting models that are untethered to the facts of the case and resemble the inadmissible "rule of thumb" methodologies rejected by courts. He proposes three profit splits—70/30, 84/16, and up to 87.9/12.1—each based on analogies to generic concepts like Google app store commissions or return on invested capital ("ROIC"), none of which tie to the parties, the products, or the patents at issue. He also makes no effort to tie these splits to the *Georgia-Pacific* factors, does not adjust based on those factors, and testified that he would still have chosen his three splits anyway regardless of which way those factors pointed. *See* Weinstein Dep. Tr. (Rough) at 132:5-133:21.

Mr. Weinstein has been repeatedly excluded for the same untethering of his analysis from the facts on the record that his present report suffers from in this case. His deficient profit splits should likewise be excluded here. *See, e.g.*, *VirnetX*, 767 F.3d at 1329 (vacating a damages verdict

3

where Mr. Weinstein used a 50/50 profit split based on the Nash Bargaining Solution that—despite referencing the *Georgia-Pacific* factors—was not sufficiently tied to the specific facts of the case); *Syneron Med. Ltd. v. Invasix, Inc.*, No. 8:16-CV-00143-DOC-KES, 2018 WL 4696969 at *7 (C.D. Cal. Aug. 27, 2018), *report and recommendation adopted*, No. SA-CV-160143-DOC-KESX, 2018 WL 11351325 (C.D. Cal. Sept. 28, 2018) (excluding Mr. Weinstein's testimony for multiple reasons, including improperly basing his reasonable royalty analysis on lost profits); *Saint Lawrence Commc'ns LLC v. ZTE Corp.*, No. 2:15-CV-349-JRG, 2017 WL 679623, at *3 (E.D. Tex. Feb. 21, 2017) (excluding Mr. Weinstein's upward adjustment of the hypothetical royalty rate as an improper double-counting).

## II.    LEGAL STANDARD

Expert testimony is admissible under the Federal Rule of Evidence only if it is "based on sufficient facts or data," "the testimony is the product of reliable principles and methods," and "the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.

It is well-settled that to satisfy its burden of proving damages, the offering party "must 'sufficiently [tie the expert testimony on damages] to the facts of the case.'" *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1315 (Fed. Cir. 2011) (quoting *Daubert*, 509 U.S. at 591). While a proxy for an accused product may be permitted in a damages calculation, the proffering expert must explain how the proxy is technologically and economically comparable to the allegedly infringing aspects of the accused product to be admissible. *See Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*, No. 2:14-CV-911-JRG, 2016 WL 4440255, at *13 (E.D. Tex. Aug. 23, 2016), *aff'd*, 880 F.3d 1356 (Fed. Cir. 2018). Moreover, "when the accused technology does not make up the whole of the accused product, apportionment is required." *MLC Intell. Prop., LLC v. Micron Tech., Inc.*, 10 F.4th 1358, 1373 (Fed. Cir. 2021) (affirming exclusion of damages expert opinions for failure to apportion); *see also Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prods. Grp.*,

LLC, 879 F.3d 1332, 1348 (Fed. Cir. 2018) ("[T]he ultimate combination of royalty base and royalty rate must reflect the value attributable to the infringing features of the product, and no more.").

Finally, profit splits in the hypothetical negotiation to determine a reasonable royalty must be tied to the facts of the case and not based on conclusory assertions. *See, e.g., VirnetX*, 767 F.3d at 1329-34 (vacating damages award based on Mr. Weinstein's profit split because it was based on "conclusory assertions" and was "insufficiently tied to the facts of the case"). Mr. Weinstein has failed to do so here.

## III.    ARGUMENT

### A.    Mr. Weinstein Fails to Apportion His Royalty Base to the Accused Aspects of Remote Connect, Digital Key, or User Profile

#### 1.    E-Key Patents ('026, '659, '188 Patents)

It is undisputed that traditional key fobs and all their functionality – such as locking, unlocking, starting and stopping a vehicle – were known in the art before EA's alleged December 24, 2012 priority date for the E-Key patents. *See, e.g.*, Ex. G ("Malek Invalidity Dep. Tr. (Rough)"), 37:11-17, 57:14-25, 182:10-20; Ex. I ("Checkoway 2011") at Fig. 1 ("Keyless entry"). Electronic keys or "E-Keys" in the form of apps on smartphones were also known before the alleged invention of the E-Key Patents, *see* Malek Invalidity Dep. Tr. (Rough), 56:25-57:8. The additional functionality patented by the three E-Key Patents, if any—per EA's *own technical expert*—is the ability for a driver to "limit[] access in accordance with privileges, and the ability to provision or revoke credentials via the claimed architecture remotely, such as through a website or application, and related tracking, and role-based permissions." Ex. H ("Malek Rebuttal Report"), ¶2478. The E-Key Patents describe these privileges as covering, for example, setting maximum speed settings for one's child:

> Logins can have "role" specific settings and privileges or settings and privileges set only by the administrator that cannot be overridden by the user of the login. For instance, an administrator may create a login for "John" their 16-year old son. The administrator can apply settings to John's login that John cannot override such as the maximum speed the vehicle can travel.

*See* '026 Patent, 16:57-63. In other words, there is no dispute that the E-Key patents ***are not infringed*** by mere locking, unlocking, or starting of a vehicle by traditional key fob or mobile device such as with Digital Key. The parties agree these functionalities belong to the prior art. Malek Rebuttal Report, ¶2478; Weinstein Dep. Tr. (Rough), 96:25-97-14.

Notwithstanding what EA contends to be the incremental benefit of the E-Key patents over the prior art, Mr. Weinstein bases his royalty base on 100% of the sale price of a "traditional key fob" multiplied by the number of vehicles that *can* use Remote Connect, regardless of whether they actually use it. Weinstein Report at ¶¶87-93, Exhibit 11. The Weinstein Report states in a conclusory sentence that "the functionality provided by traditional key fobs is similar to the functionality provided by the [E-Key] patents." Weinstein Report, ¶87. Mr. Weinstein, however, never explains *what* that patented functionality is or *why* traditional key fobs are so similar to it that they need zero apportionment.  Instead, Mr. Weinstein only vaguely compares traditional key fobs to Remote Connect with Digital Key as a whole. Weinstein Report, ¶¶87-93.

Mr. Weinstein's report thus contains no apportionment analysis for the E-Key Patents ***at all***; it only includes three profit-splitting analyses that Toyota and EA would allegedly have used to divide the profits attributable to the patented technology between them. *See* Weinstein Report, ¶¶101-21. Mr. Weinstein simply assumes without explanation that Digital Key and traditional key fobs have no non-infringing value whatsoever. *See id.* This is especially bizarre given that Mr. Weinstein's chosen proxy—a traditional key fob—is prior art and does not practice ***any*** part of the

6

E-Key Patents. Weinstein Dep. Tr. (Rough), 96:25-97-14. A traditional key fob includes **only** non-infringing features.

Mr. Weinstein's failure to apportion the value of Toyota's Digital Key or traditional key fob products to the patented features of the E-Key Patents mirrors his previous failure to do so in *VirnetX*. There, Mr. Weinstein opined that he was "using the lowest saleable unit" and "based his calculations [on] the base price at which each product was sold." *VirnetX*, 767 F.3d at 1328. The Federal Circuit nevertheless found that "Weinstein did not even attempt to subtract any other unpatented features from the [royalty] base, which therefore included features indisputably not claimed by VirnetX, e.g., touchscreen, camera, processor, speaker, and microphone, to name but a few." *Id.* Here, as in *VirnetX,* Mr. Weinstein "should have identified a patent-practicing feature with a sufficiently close relation *to the claimed functionality*. The law requires patentees to apportion the royalty down to a reasonable estimate of the value of its claimed technology, or else establish that its patented technology drove demand for the entire product." *Id.* (emphasis added). Mr. Weinstein did neither, and his royalty base for the E-Key Patents should therefore be excluded.

### 2.    User Profile Patent ('268 Patent)

Mr. Weinstein also fails to apportion the User Profile Patent, attributing 100% of the sale price of unaccused hardware seat memory switches to EA's User Profile Patent without explanation. *See* Weinstein Report, ¶96; Weinstein Supp. at Ex. 12. EA's technical expert, Dr. Malek, opined that the User Profile Patent covers "the transfer of user profiles" across multiple "vehicles having differing features and functionality." Malek Report, ¶2533-34. Mr. Weinstein's report does not explain how a seat memory switch, Weinstein Report, ¶94, n. 239, 240, would (1) have zero non-infringing value or (2) represent the value of *only* the infringing portion of User Profile when Mr. Weinstein himself concedes that a seat memory switch does not even practice the User Profile Patent, Weinstein Dep. Tr. (Rough), 128:2-5.

Mr. Weinstein never analyzes, discloses, or even mentions *what* the infringing portion of either Toyota's User Profile software or the seat memory switch allegedly *is*. And like the E-Key Patents, Mr. Weinstein conceded during his deposition that seat memory switches contain functionality not covered or even disclosed by the User Profile Patent. Weinstein Dep. Tr. (Rough) 128:2-130:11 (admitting that a seat memory switch both (1) does not practice the User Profile Patent and (2) advantageously allows seat adjustment without the use of either a cellular network or even a cell phone). Mr. Weinstein's royalty base for the User Profile Patent should therefore be excluded for failure to apportion.

**B.      Mr. Weinstein Fails to Perform the Necessary Technological and Economic Comparability Analysis for His Remote Connect and User Profile Proxies**

For his royalty base for both the E-Key Patents and the User Profile Patent, Mr. Weinstein relies on the full, unapportioned market value of one or more proposed proxies.[3] For the E-Key Patents, Mr. Weinstein proposes using one of three "traditional key fobs." Weinstein Report, ¶¶84-93. For the User Profile Patent, Mr. Weinstein proposes using a "Sienna Memory Seat Switch." Weinstein Report, ¶¶94-98. For each alleged proxy, Mr. Weinstein cannot explain how or why that proxy is technically and economically comparable to the accused products, and his opinions on them are deficient. *See Core Wireless*, 2016 WL 4440255 at *13 (ordering a new trial on damages where Windows Mobile proxy was not shown to be "technologically and economically comparable" to Android).

As an initial matter, Mr. Weinstein testified that he determined both the technological and economic comparability of his proxies *by himself*, without ever relying on EA's technical expert, despite also admitting that he did not have a technical degree and was not qualified to testify about

---

[3] For the E-Key Patents, Mr. Weinstein also relies on the unapportioned MSRP of the Digital Key itself as an alternative to any of his three proxies. Weinstein Report at ¶92, Exhibits 10-11.

the technical aspects of automobile features. *See* Weinstein Depo Tr. (Rough) 21:15-20; ("Q. You wouldn't be qualified to offer an opinion [on] how certain features of an automobile work? A. Certainly not from a – from a technical standpoint, that's true."); 94:6-9 ("Q. Okay. You're not relying on Dr. Malek for any analysis of comparability of the proxy to the patents-in-suit? A. That's correct."); *see also id.*, 20:22-22:15.

Mr. Weinstein's proxies are legally deficient for the same reasons as the proxy in *Core Wireless*. In *Core Wireless*, there was "no evidence" that the proxy "practices the patent, and it was not an accused product at trial." *Id.* Mr. Weinstein likewise admits that neither set of proxies practice *any* of EA's asserted patents, and neither is accused of doing so by EA. Weinstein Dep. Tr. (Rough), 96:25-97-14 (key fobs); 128:2-5 (seat memory switches). In *Core Wireless*, the expert "failed to account for any differences between the two products." *Core Wireless*, 2016 WL at *13. Mr. Weinstein's report never addresses the differences between his proposed proxies and the accused products either, despite his admission that such differences exist. Weinstein Dep. Tr. (Rough), 96:25-97:14, 101:23-102:23 (key fobs); 128:2-130:11 (seat memory switches).

Mr. Weinstein bases his entire proxy theory for the traditional key fob off a handful of remarks from Toyota representatives that Digital Key operates similarly to a traditional key fob in *general*. Weinstein Report, ¶¶84-87. But just *any* vague similarity in the abstract will not do. The comparison Mr. Weinstein relies on has no nexus, whatsoever, with *the E-Key Patents*, which EA contends are directed to *the sharing of privileges*. *See VirnetX*, 767 F.3d at 1330 ("In *ResQNet*, we faulted the district court for relying on licenses with 'no relationship to the claimed invention,' nor even a 'discernible link to the claimed technology.'"). Mr. Weinstein's report never even mentions the word "privileges," outside of his quotation of the abstract of the '659 patent, let alone analyzes how a traditional key fob can share "privileges" like EA alleges the Digital Key can. Weinstein

███████████████████████████████

Report, ¶ 22. Mr. Weinstein's comparability analysis for the seat memory switch for the User Profile Patent is even worse. He simply remarks that a seat memory switch and Toyota's User Profile provide similar benefits without providing any analysis of how they are technologically and economically comparable in the context of the User Profile Patent, which Mr. Weinstein concedes his proxy does not practice. Weinstein Dep. Tr. (Rough), 128:2-5; *see VirnetX*, 767 F.3d at 1330.

Mr. Weinstein's selections of traditional key fobs for the E-Key Patents and a Sienna seat memory switch for the User Profile Patent are thus "conclusory and wholly unsupported by the evidence." *Core Wireless*, 2016 WL at *13. There is no evidence that these proxies are technologically or economically comparable to the accused products as they relate to the Asserted Patents—and Mr. Weinstein conceded that he was not qualified to testify as to their technical features. Mr. Weinstein's proxy opinions are therefore deficient and should be excluded. *See id.*

### C.    Mr. Weinstein's Profit Split Models Are Deficient

Mr. Weinstein's reasonable royalty should also be excluded for using "profit split" models that are wholly untethered to the facts of the case. He opines that under three different profit-splitting approaches, Toyota and EA would have agreed to split the entirety of Toyota's profit margin for either Digital Key or a "traditional key fob" (E-Key Patents) or a "Sienna Memory Seat Switch" ('268 Patent) by allocating the profits to EA according to one of three splits:

1.   A **70/30** "app store" where Toyota would give EA 70% of the entire profit of a traditional key fob based on the split employed by the Apple App or Google Play stores;

2.   An ██████ "dealer fee" split based on the premise that ████████████████ ████████████████████████████████████████████ ████████████████████████████████████

███████████████████████████████████████████████████

3. An **84.5/15.5** or **87.9/12.1** "ROIC" split based on Mr. Weinstein's assertion

that ████████████████████████████████████████████████████

on average and that therefore it would have agreed to give EA either 84.5%

or 87.9% of all of its profits from Mr. Weinstein's royalty bases.

Weinstein Report ¶¶ 110-13.

Mr. Weinstein's three "profit splits" have nothing to do with the relationship between the parties, the products, or the patented technology and fail to satisfy the requirements of *Daubert*. *See Uniloc*, 632, F.3d at 1318; *Droplets Inc. v. Yahoo! Inc.*, No. 12-cv-03733-JST, 2022 WL 2670163 at *5 (N.D. Cal. Jan. 12, 2022) ("Bergman's analysis fails because he does not explain how the identified [*Georgia-Pacific*] factors compel a 35/65 profit split.").

Mr. Weinstein's opinions have been excluded numerous times for the same untethered profit splitting that he attempts to do here. *See, e.g., VirnetX*, 767 F.3d at 1329-34 (vacating damages award based on Mr. Weinstein's profit split because it was based on "conclusory assertions" and was "insufficiently tied to the facts of the case"); *Suffolk Technologies LLC v. Aol Inc.,* No. 1:12-cv-625, 2013 WL 12156056 at *3 (E.D. Va. Apr. 12, 2013) (excluding Mr. Weinstein's testimony where he "does not explain why these parties would have accepted a 50/50 split" and finding the split was "plainly not tied to the facts of this case.").

1. **Mr. Weinstein's Profit Splits Are Untethered From His Analysis of the *Georgia-Pacific* Factors**

As an initial matter, all three of Mr. Weinstein's profit splits are legally deficient for failing to account for the *Georgia-Pacific* factors. Mr. Weinstein simply lays out his purported analysis of the *Georgia-Pacific* factors at the beginning of his report, then lays out three profit splits that make no mention of his earlier analysis and, indeed, do nothing to account for that analysis. *See* Weinstein Report, ¶¶108-110 (listing only "relative bargaining power" factors, then failing to

explain how even *those* factors affect his profit splits). Mr. Weinstein admitted during his deposition that he did not adjust his profit splits by his consideration of the parties' bargaining power and that he would have still chosen the same three profit split models regardless of how the *Georgia-Pacific* factors played out. *See* Weinstein Dep. Tr. (Rough) at 132:5-133:21.

Mr. Weinstein's profit split models fail to incorporate *Georgia-Pacific* and should therefore be excluded. *See Exmark,* 879 F.3d at 1349-51 (vacating a damages award and remanding for a new trial because district court did not exclude an expert opinion that recited the *Geogia-Pacific* factors but failed to explain their influence on the ultimate royalty rate); *Droplets Inc.,* 2022 WL at *5 ("Bergman's analysis fails because he does not explain how the identified [*Georgia-Pacific*] factors compel a 35/65 profit split.").

### 2.    70/30 "App Store" Profit Split

Mr. Weinstein's first profit split is a 70/30 division wherein Toyota would agree to give EA 70% of the profit while taking only 30%. Weinstein Report, ¶112. Mr. Weinstein's entire basis for this figure is a comparison to the Apple App or Google Play stores, each of which allegedly provides developers 70% of revenues from sales of their applications. *Id.*

A reasonable royalty rate based on an estimated profit split is arbitrary and should be excluded if it relies on factors unrelated to the specific facts of the case. *See VirnetX*, 767 F.3d at 1329–34. In *VirnetX*, Mr. Weinstein calculated cost savings attributed to the patented technology and proposed a 50/50 split as a reasonable starting point for negotiations over those savings. *Id.* He then applied the *Georgia-Pacific* factors to arrive at a 45% royalty rate. *Id.* However, the Federal Circuit held that the 50/50 starting point was arbitrary and disconnected from the case's factual record. *Id.* Even though Mr. Weinstein applied the *Georgia-Pacific* factors in *Virnetx* (despite not doing so here), the Federal Circuit emphasized that "beginning from a fundamentally

████████████████████████████████

flawed premise and adjusting it based on legitimate considerations specific to the facts of the case nevertheless results in a fundamentally flawed conclusion." *Id.* (quoting *Uniloc*, 632 F.3d at 1315).

Nothing Mr. Weinstein cites in support of his 70/30 split is specific to the specific facts of this case. A car is not an app store. And the analogy of a patentee to a developer and a licensee to Apple or Google could just as easily apply in *any case*. Case in point: other damages experts have unsuccessfully tried to employ this exact same 70/30 "app store" analogy in other recent damages opinions for completely different cases with different parties, including Google itself. *See, e.g.*, *Sonos, Inc. v. Google LLC*, No. C 20-06754 WHA, 2023 WL 3933071, at *9 (N.D. Cal. June 9, 2023) (striking testimony to a 70/30 "app store" split even where Google was a party because the split was "not specific to Sonos or the technology claimed by the patents-in-suit"). Mr. Weinstein's 70/30 *de facto* rule of thumb should likewise be excluded. *Uniloc*, 632 F.3d at 1315.

### 3.    ████ "Dealer Fee" Profit Split

Mr. Weinstein's second profit-splitting model purports that Toyota and EA would have agreed to split profits ███████████████████████████████████████████████████, except that instead of ██████████████████████████████████████████ EA would receive ████ and Toyota would agree to receive only ████ instead. Mr. Weinstein supports this theory with only a single conclusory sentence: Toyota would agree to ████ "for its role in selling the accused functionalities." Weinstein Report, ¶111.

But Mr. Weinstein's analogy has no grounding in the facts of this case. Toyota is not a dealer, and EA is not Toyota. Mr. Weinstein admitted during his deposition that he did nothing to account for the fact that Toyota would provide "manufacturing," "R&D," and "development" when Toyota's dealers do none of these things:

> Q. All right. But in this license negotiation, Toyota's getting the same percentage that the dealers get; right?

██████████████████████████████

> **A. Based on the ROIC, Toyota gets a very similar percentage to what the dealers get. I agree with that.**
> Q. Despite contributing a lot more than the dealers?
> **A. Despite contributing more than the dealers, yes.**

Weinstein Tr. (Rough) 160:2-19; *see also id.* at 157:24-160:1. Mr. Weinstein's purported ███ "dealer fee" split is not "specific to the facts of the case"—it is not even specific to *Toyota and EA*. It should be excluded.

### 4. 84.5/15.5 (User Profile) or 87.9/12.1 (E-Key) "ROIC" Profit Split

Mr. Weinstein's third and most imbalanced profit-splitting model of either 84.5/15.5% (User Profile Patent) or 87.9/12.1% (E-Key Patents) is based on Toyota's alleged return on invested capital or "ROIC," the only foundation for which is two so-called "Morningstar Equity Research" articles cited, but were not produced until weeks after the close of fact discovery. Weinstein Report ¶ 110, n. 264.

Mr. Weinstein's opinion attributing 84.5-87.9% of all profits to EA is even more arbitrary than his "app store" or "dealer fee" theories. First, there are no facts indicating that Toyota and EA have *ever* relied on ROIC, or that either party would have relied on Mr. Weinstein's unproduced Equity Research Report. Second, Weinstein baldly assumes that Toyota would pay EA 84.5-87.9% of the total profits for its own traditional art key fobs in a hypothetical negotiation solely for the ability to allow drivers to assign privileges to other users. Malek Rebuttal Report, ¶2478. Much like in *Virnetx* where Mr. Weinstein arbitrarily assumed a 50/50 starting point in negotiations, Mr. Weinstein now assumes an even more lopsided 84.5-87.9% split based on an unrelated economic figure *that every company has*. *See* Weinstein Report, ¶110, at Exhibit 15. Courts routinely reject hypothetically generalized profit splits that the expert does not connect to the parties and technology at issue. *See, e.g., Bayer HealthCare LLC v. Baxalta Inc.*, 2019 WL 330149, at *7-8 (D. Del. Jan. 25, 2019) (excluding expert testimony that failed to "tie [a] 50/50 split to the facts of

14

[the instant] case" and rejecting "vague reference[s] to experience and common sense"); *NexStep, Inc. v. Comcast Cable Commc'ns, LLC*, No. CV 19-1031-RGA, 2021 WL 4207442, at *2-3 (D. Del. Sept. 16, 2021); *Robocast, Inc. v. Microsoft Corp.*, No. CV 10-1055-RGA, 2014 WL 350062, at *1-3 (D. Del. Jan. 29, 2014) (*citing Uniloc*, 632 F.3d at 1318).

Mr. Weinstein suggests that his use of ROIC is *per se* admissible because it was allowed once in this Court on different facts. *See* Weinstein Report, ¶110, n. 261. Mr. Weinstein omits that his use of ROIC has more recently been excluded for the same failure as here: a lack of a tie from ROIC to the facts of the case. *See Fundamental Innovation Sys. Int'l LLC v. Anker Innovations, Ltd.*, No. 21-339-RGA, slip op. at 31–33 (D. Del. Feb. 11, 2025). Mr. Weinstein could take the same ROIC opinion from his report and insert *any* patentee for EA, *any* licensee for Toyota, *any* patent for the E-Key Patents and User Profile Patent and *any* accused product for Remote Connect and User Profile. Mr. Weinstein offers no analysis tying ROIC to any specific fact in this case other than the fact that Toyota, like *all* for-profit companies, has an ROIC. *See id.* (excluding ROIC model where the Court "fail[ed] to see how Anker's ROIC is tied to the facts and parties of this case, aside from Anker being a party to the case").

Mr. Weinstein's ROIC split, like his other splits, is thus a thinly veiled "rule of thumb" that the Federal Circuit has–time and again–instructed complete exclusion of. *See VirnetX*, 767 F.3d at 1329–34; *see also Versata Software Inc. v. SAP Am. Inc.*, No. 2:07-CV-153 CE, 2011 WL 4017939 at *4 (E.D. Tex. Sept. 9, 2011) (excluding Mr. Weinstein's testimony because his reasonable royalty rate was "nothing more than an unsupported percentage of SAP's total revenue."). It should be excluded here.

## IV.    CONCLUSION

For these reasons, Toyota respectfully requests that the Court grant its Motion to Exclude the Expert Opinions and Testimony of Roy Weinstein.

Dated: April 14, 2025

Respectfully submitted,

/s/ James R. Barney
James R. Barney (LEAD) (DC Bar No. 473732)
Ryan T. Davies (DC Bar No. 1686044)
Alexander E. Harding (admitted *pro hac vice*)
Nicholas A. Eitsert (admitted *pro hac vice*)
Ariel Batiste (admitted *pro hac vice*)
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER, LLP
901 New York Avenue, NW
Washington, DC 20001-4413
Tel. (202) 408-4000

Aidan C. Skoyles (admitted *pro hac vice*)
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER, LLP
1875 Explorer St Suite 800
Reston, VA 20190-6023
Tel. (571) 203-2700

Michael C. Smith (TX Bar No. 18650410)
SCHEEF & STONE, LLP
113 E. Austin Street
Marshall, Texas 75670
Office: (903) 938-8900
michael.smith@solidcounsel.com

*Counsel for Defendants Toyota Motor Corp.,*
*Toyota Motor North America, Inc., and Toyota*
*Motor Sales, U.S.A., Inc.*

**CERTIFICATE OF SERVICE**

The undersigned certifies that on April 14, 2025, a true and correct copy of the above document was served on all counsel of record via electronic mail.

*/s/ James R. Barney*
James R. Barney

**CERTIFICATE OF CONFERENCE**

The undersigned certifies that the parties have met and conferred in compliance with Local Rule CV-7(h) regarding this motion. On April 11, 2025, EA indicated that it opposed the relief requested in this motion.

*/s/ James R. Barney*
James R. Barney