IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | |
|---|---|
| EMERGING AUTOMOTIVE LLC,<br><br>    Plaintiff,<br><br>    v.<br><br>KIA CORPORATION and KIA AMERICA, INC.,<br><br>    Defendants. | Civil Action No. 2:23-cv-00437-JRG<br><br>LEAD CASE |
| EMERGING AUTOMOTIVE LLC,<br><br>    Plaintiff,<br><br>    v.<br><br>TOYOTA MOTOR CORP., et al,<br><br>    Defendants. | Civil Action No. 2:23-cv-00434-JRG<br><br>MEMBER CASE |

**PLAINTIFF EMERGING AUTOMOTIVE'S OPPOSITION TO
TOYOTA DEFENDANTS' MOTION TO EXCLUDE THE
<u>TESTIMONY AND OPINIONS OF ROY WEINSTEIN</u>**

# TABLE OF CONTENTS

|    |    |    | Page |
|----|----|----|------|
| I. | Introduction | | 1 |
| II. | Argument | | 1 |
| | A. | Mr. Weinstein's Benchmark Theory of Damages Has Been Repeatedly Endorsed by The Federal Circuit | 1 |
| | | 1. Mr. Weinstein's Benchmark Theory of Damages | 2 |
| | |    a. E-Keys Patents Proxy Analysis | 2 |
| | |    b. Profile Patent Proxy Analysis | 3 |
| | | 2. Mr. Weinstein's Benchmark Theory of Damages Has Been Expressly Endorsed by the Federal Circuit and This District | 5 |
| | | 3. Defendants' Arguments Fail | 6 |
| | B. | Mr. Weinstein Was Not Required to do a Further "Bargaining Split" After Determining a Royalty Based on the Benchmarks; Regardless, His Opinions on Bargaining Split are Rooted in the Facts of the Case | 10 |
| | | 1. Mr. Weinstein's ROIC Opinion is Reliable | 11 |
| | | 2. Mr. Weinstein's Other Bargaining Split Opinions are Reliable | 14 |
| III. | Conclusion | | 15 |

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Apple Inc. v. Motorola, Inc.*,
   757 F.3d 1286 (Fed. Cir. 2014) ................................................................................................ 5

*Arctic Cat Inc. v. Bombardier Recreational Products Inc.*,
   876 F.3d 1350 (Fed. Cir. 2017) ................................................................................................ 6

*Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*,
   No. 2:14-CV-911-JRG, 2016 WL 4440255 (E.D. Tex. Aug. 23, 2016) .................................... 9

*Droplets, Inc. v. Yahoo! Inc.*,
   No. 12-CV-03733-JST, 2022 WL 2670163 (N.D. Cal. Jan. 12, 2022) ................................... 13

*Exmark Mfg. Co. v. Briggs & Stratton Power Prods. Grp.*,
   879 F.3d 1332 (Fed. Cir. 2018) .............................................................................................. 13

*Finjan, Inc. v. Secure Computing Corp.*,
   626 F.3d 1197 (Fed. Cir. 2010) ........................................................................................ 12, 15

*i4i Ltd. P'ship v. Microsoft Corp.*,
   598 F.3d 831 (Fed. Cir. 2010) ............................................................................................. 5, 6

*Image Processing Techs., LLC v. Samsung Elecs. Co., Ltd.*,
   No.2:20-cv-00050-JRG-RSP, 2020 WL 3513523 (E.D. Tex. June 29, 2020) ............. 6, 8, 9, 10

*Nanoco Techs., Ltd. v. Samsung Elecs. Co.*,
   No. 2:20-CV-00038-JRG, 2022 WL 10986185 (E.D. Tex. Sept. 21, 2022) ........................... 12

*Summit 6 LLC v. Samsung Elecs. Co.*,
   802 F.3d 1283 (Fed. Cir. 2015) ..................................................................................... 1, 5, 8, 9

*VirnetX, Inc. v. Cisco Sys., Inc.*,
   767 F.3d 1308 (Fed. Cir. 2014) .................................................................................. 10, 13, 15

I. **INTRODUCTION**[1]

At best for Defendants, their *Daubert* arguments go to the weight of Mr. Weinstein's opinions and not their admissibility. Accordingly, Defendants' motion should be denied.

**The Benchmark Theory of Damages is Admissible**: This Court and the Federal Circuit have repeatedly ruled that using comparable features in the marketplace is a viable and proper theory of reasonable royalty damages. Given that this is the exact theory of damages used by Mr. Weinstein, it should not be excluded.

**Bargain Splitting**: Mr. Weinstein's use of Defendants' return on invested capital ("ROIC") at the time of the hypothetical negotiation to determine how the parties would have hypothetically split the incremental profits specifically attributable to the asserted patents is an opinion that is tied to these specific Defendants and to the facts of this case. It is not an impermissible "rule of thumb." A patent license—i.e., money in exchange for use of a patented technology—is an investment in the use of patented technology, making ROIC an apt methodology for determining how the parties could and would hypothetically split profits. Moreover, Defendants fail to identify anything that is improper with respect to Mr. Weinstein's *methodology* for analyzing relative bargaining power. Rather, their gripes go to the weight of his testimony. Mr. Weinstein's alternative methods for a hypothetical bargaining split—e.g., ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ are also tied to the facts of the case and admissible.

II. **ARGUMENT**

    A. **Mr. Weinstein's Benchmark Theory of Damages Has Been Repeatedly Endorsed by The Federal Circuit**

---

[1] Exhibits A-I are attached to Defendants' motion. Exhibits J-P are attached to the Belloli Declaration.

1.     Mr. Weinstein's Benchmark Theory of Damages

  a.  E-Keys Patents Proxy Analysis

The electronic keys (e-keys) patents asserted against Toyota are titled (1) "Vehicles and Cloud Systems for Assigning Temporary E-Keys to Access Use of a Vehicle"; (2) "Methods and Systems for Using Cloud Services to Assign E-Key to Access Vehicle"; and (3) "Vehicles and Cloud Systems for Sharing E-Keys to Access and Use Vehicles." Ex. J, Ex. K; Ex. L. As the titles of the patents suggest, the patents concern new and novel electronic keys (e-keys) for vehicles that allow a user to enable functions of the vehicle, for example, starting, stopping, locking and unlocking of the vehicle. Ex. N, ¶¶ 39-41; *see also* Ex. A, ¶ 13. The e-keys technology is implemented using mobile devices such as smartphones. Ex. N, ¶¶ 39-41. The vehicle owner may use or share the patented e-keys with others to allow use of the vehicle via the e-key. *Id.* For example, the owner could share an e-key for his car with a valet or a family member and, once shared, the shared user may use the electronic key on his or her smartphone to enable functions of the vehicle by pressing open, lock, or start on the device. *Id.* The patented e-keys may also be associated with privileges, which may include what type of access or use a user may have. *Id.*

Given that the patents concern new and novel e-keys, what is accused of infringement are two different e-key services provided by Defendants: (1) Remote Connect and (2) Remote Connect with Digital Key ("Digital Key"). Ex. A, ¶ 23.

Mr. Weinstein therefore looked to Defendants' own key fobs as a benchmark or proxy for determining the value of the infringing e-key services. *Id.*, ¶¶ 68-74, 84-93, 115-118. Based on his review of Toyota's own documents, Toyota deposition testimony and a discussion with Emerging

Auto's technical expert, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮  This analysis was further bolstered and confirmed by Mr. Weinstein's conversations with Emerging Auto's technical expert, Dr. Malek. *Id.*

Mr. Weinstein then analyzes the various proxies/benchmarks for traditional Toyota key fobs. *Id.*, ¶¶ 88-93. As Mr. Weinstein explains, the "benchmark or product theory [of damages] involves comparing the value of infringing features based upon comparable features in the marketplace, or valuing infringing features by comparing the accused product to non-infringing alternatives," such as comparing the patented e-keys to unaccused traditional key fobs. *Id.*, ¶ 33. Moreover, "[p]roxies often are used by economists to estimate the value of variables which are unobservable or difficult to measure." *Id.*, ¶ 87. This "market approach" generally, and this benchmark product theory specifically, is an admissible theory of reasonable royalty damages.

### b. Profile Patent Proxy Analysis

The profile patent is titled "Methods and Systems for Setting and Transferring User Profiles to Vehicles and Temporary Sharing of User Profiles to Shared-Use Vehicles." Ex. M. The patent

-3-

concerns the automatic transfer of user profile settings to vehicles and the employment of a cloud processing system to manage, update, learn from, improve upon, and automatically implement a personalized vehicle-user experience. Ex. N, ¶¶ 46-47; Ex. A, ¶ 14. The inventions offer a specific, personalized user experience, defined by preferences the user sets in a user profile, while simultaneously achieving the scalability of applying those personalized settings to various shared vehicles and shared vehicle services—supporting a wide range of user preferences and vehicle types by, e.g., providing for a compatibility check between settings in the user profile and available settings on the vehicle before transferring the profile settings for programming on the vehicle. Ex. N, ¶ 47. The '268 patent involves transferring user profile settings and making those settings available to a user from vehicle to vehicle. As part of this process, there is a compatibility check so that a selected vehicle has particular settings available. *Id.*

Emerging Auto accuses Toyota's "user profile" service that communicates the user profile settings to Toyota vehicles for the benefit of the user. Ex. A, ¶ 23. In describing the accused features, Defendants state, among other things, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Mr. Weinstein therefore looked to Defendants' memory seat kits which allow for the saving of driver position presets for multiple drivers and select a given preset to automatically adjust the driver's seat, rear-view mirrors, and head-up display. *Id.*, ¶¶ 73, 94-98, 119-120. Based on his review of Toyota's own documents, Toyota deposition testimony and a discussion with Emerging Auto's technical expert, Mr. Weinstein opines that:



¶ 96.[2]

### 2. Mr. Weinstein's Benchmark Theory of Damages Has Been Expressly Endorsed by the Federal Circuit and This District

Comparing the value of a patented, infringing feature to the value of a functionally comparable infringing or non-infringing feature in the marketplace is an accepted and expressly endorsed theory of estimating a reasonable royalty. *Summit 6 LLC, v. Samsung Elecs. Co.*, 802 F.3d 1283, 1296 (Fed. Cir. 2015) ("A party may use the royalty rate from sufficiently comparable licenses, value the infringed features based upon ***comparable features in the marketplace, or value the infringed features by comparing the accused product to non-infringing alternatives***.") (emphasis added); *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1314 (Fed. Cir. 2014) (overruled on other grounds) (affirming there is more than one reliable method for estimating a reasonable royalty including using comparable licenses, ***comparable features in the marketplace or comparable non-infringing alternatives***); *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 854 (Fed. Cir. 2010) (affirming use of a ***benchmark product*** in the market for royalty calculation); *Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*, 876 F.3d 1350, 1369-1370

---

[2] Defendants' discussion regarding Remote Connect subscription revenue including non-accused functionalities such as music streaming is a red herring. Dkt. 180 at 2. As Mr. Weinstein confirmed, although he reviewed information regarding Defendants' subscription revenue, he did not use the revenue in his royalty calculations but instead concluded that such revenue would tend to increase the bargaining power of Emerging Auto at the hypothetical negotiation. Ex. A, ¶¶ 53-55.

(Fed. Cir. 2017) (affirming use of **benchmark product** in the market for royalty calculation); *Image Processing Techs., LLC v. Samsung Elecs. Co.*, No. 2:20-CV-00050-JRG, 2020 WL 2499736, at *4 (E.D. Tex. May 14, 2020) ("Furthermore, [the damages expert's] methodology of valuing the infringed features based upon **comparable features in the marketplace** has already been endorsed by the Federal Circuit.") (emphasis added).

Here, Mr. Weinstein's damages theory is expressly tied to a closely comparable feature in the marketplace. For example, the e-keys patents concern new and novel e-keys for vehicles that allow users to enable starting, stopping, locking and unlocking of the vehicle via a smartphone. Ex. N, ¶¶ 39-41; *see also* Ex. A, ¶ 13. This is highly similar to the functionality of the unaccused traditional key fobs which are a cruder form of an electronic key for accessing the vehicle. Ex. A, ¶¶ 68-74, 84-93. Mr. Weinstein was therefore free to opine, as he did, that in "this case, the value provided by the Patents-in-Suit can be measured by considering the value of traditional key fobs as a proxy, since the functionality provided by the traditional key fobs is similar to the functionality provided by the '188, '026, and '659 patents." *Id.*, ¶ 87.

Mr. Weinstein performs the same analysis with respect to the profile patent, the accused functionality and the memory seat kit benchmark. *Id.*, ¶¶ 73-74, 94-98, 119-120.

3. **Defendants' Arguments Fail**

Defendants' primary argument is that Mr. Weinstein did not apportion. Dkt. 180 at 1-2, 4-8. Not true. The benchmark theory is the apportionment that measures the incremental value of the patented technology. All that is required is a comparison of the infringing feature to a functionally comparable infringing or non-infringing feature. *i4i Ltd. P'ship*, 598 F.3d at 854. Here, that is exactly the analysis Mr. Weinstein performed. Mr. Weinstein isolated the patented/accused feature—the accused e-keys. Based on his understanding from Dr. Malek and Toyota's own documents he then found that the patented functionality ████████████

-6-

███████████████████████████████████████████████████ No further "apportionment" is required because the theory is limited to a comparison of the patented feature and a comparable feature in the marketplace—i.e., key fobs to remote lock/unlock and engine start/stop. This damages theory does not, therefore, go beyond the footprint of the invention.

Defendants' argument—that "Mr. Weinstein's report [] contains no apportionment analysis for the E-Key Patents *at all*" (Dkt. 180 at 6)—is simply wrong. Indeed, Mr. Weinstein isolated the patented e-keys and then compared that patented feature to its functional substitute, the key fob. He does not need to apportion beyond the patented feature—i.e., the new and novel e-keys covered by the patents-in-suit. What Mr. Weinstein did not do, which would have been improper, is start with the entire value of the vehicle[3] and not apportion down to the value of the patented e-keys. Instead, he started with the patented e-keys and then compared that patented feature to its functional substitute, the key fob. Mr. Weinstein did not, as Defendants suggest, use the entire

---

[3] *See, e.g.*, '026 patent, claim 1, directed to a "vehicle configured to communicate with a server of a cloud system to enable access to use the vehicle via one or more electronic keys." Ex. J.

market value rule here. Ex. P, Weinstein Tr. at pp. 88-89 (Mr. Weinstein confirming he did not use the entire market value rule and further explaining why no further apportionment is required when using a proxy product theory of damages.)

The use of a proxy product that is sufficiently technically and economically comparable to the patented invention is the act of apportionment. It is a different damages methodology from situations, for example, in which there is a broader product (i.e., a computer) and a requirement to apportion down to the smallest saleable patent practicing unit, such as a processor. Here, the new/novel feature is the patented e-keys, and Mr. Weinstein starts with the patented feature. He then finds the closest substitute as a benchmark or a proxy, the key fob. He then explains how the patented e-keys provide more functionality than the cruder key fob and are therefore at least as valuable as the proxy. Thus, limiting damages to the footprint of the invention is attained via the benchmark theory. *Summit 6*, 802 F.3d at 1296; *Image Processing Techs., LLC*, 2020 WL 2499736, at *4. He performs the same analysis for the profile patent.

Tellingly, the majority of Defendants' gripes are that the proxies are not sufficiently comparable, suggesting that a proxy is only acceptable if there is 100% overlap between the patented features and the proxy features. Dkt. 180 at 5-10. But these legally incorrect arguments go to the weight Mr. Weinstein's testimony should be given, not whether his methodology is unsound. Moreover, the only case that Defendants cite where a benchmark theory was found to be insufficiently comparable as a matter of law—*Core Wireless*—is inapposite on its facts.

In *Core Wireless*, an expert used the price of the Windows Mobile operating system in a magazine article published five years before the hypothetical negotiation as a benchmark for LG's Android operating system. *Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*, No. 2:14-CV-911-JRG, 2016 WL 4440255, at *11-13 (E.D. Tex. Aug. 23, 2016). Because the expert failed to rely

on evidence that Windows Mobile was technically comparable to Android or any evidence regarding the value of Windows Mobile or Android at the time of the hypothetical negotiation, this Court found that the expert "did not adequately tie his analysis to the 2013 hypothetical negotiation date." *Id.*, at \*12-13. Further, there was also evidence that the price of Windows Mobile was zero at the time of the hypothetical negotiation. *Id*. The Court found that this was not sufficient. *Id*.

Here, and in stark contrast, Mr. Weinstein compares the patented featured with a comparable feature in the market—a universally accepted way to calculate damages. *Summit 6, LLC*, 802 F.3d at 1296; *Image Processing Techs., LLC*, 2020 WL 2499736, at \*4. Indeed, for the technical portion, Mr. Weinstein isolates the infringing feature (the patented e-keys) implemented in the accused products (vehicles with Defendants' infringing e-key services) and shows they are technically and economically comparable to a close functional substitute (Defendants' key fob). Ex. A, ¶¶ 68-74, 84-93, 115-18.[4] For the economic portion, Mr. Weinstein relies on information regarding Defendants' own benchmark key fobs. *Id*.

*Id.*, ¶¶ 73-74, 94-98, 119-20.

Therefore, unlike in *Core Wireless*, Mr. Weinstein's opinions are fully supported based on the specific facts of this case.

---

[4] Defendants harp on the fact that Mr. Weinstein is not qualified "technically" to provide an opinion regarding his proposed proxies. Dkt. 180 at 8-9. Defendants omit that Mr. Weinstein spoke with Dr. Malek prior to submitting his report to confirm that Dr. Malek agreed that using a traditional key fob and a seat memory switch as proxies was appropriate. Ex. A, ¶ 87, Fn. 210, ¶ 95, Fn. 242-243. Moreover, Defendants omit portions of Mr. Weinstein's deposition testimony wherein he explains how a proxy needs to be relevant and how he was able to determine which products to use as proxies. Ex. P, Weinstein Tr., pp. 94-100.

Defendants' argument that Mr. Weinstein did not apportion the proxy because it is "different" is erroneous. The proxy will, by definition, be different from the infringing product. The law only requires the identification of a sufficiently comparable benchmark to the patented feature to approximate value—i.e., the "methodology of valuing the infringed features based upon ***comparable features in the marketplace***." *Image Processing Techs., LLC*, 2020 WL 2499736, at *4. This is something Mr. Weinstein clearly did.

Defendants' apportionment arguments are just complaints that the four Toyota key fob and the memory seat proxies that Mr. Weinstein relies upon are not sufficiently close proxies. But given the evidence that the patented e-keys and profile technology are functional substitutes for the proxies, whether the proxies are an appropriate measure of damages is a question for the jury, and not a question of whether Mr. Weinstein used an acceptable methodology. The Court should deny Defendants' motion.

> **B.    Mr. Weinstein Was Not Required to do a Further "Bargaining Split" After Determining a Royalty Based on the Benchmarks; Regardless, His Opinions on Bargaining Split are Rooted in the Facts of the Case**

Emerging Auto is unaware of any case holding that a bargaining split must be applied to a benchmark theory of damages, which makes sense as a benchmark theory is not tied to profits; rather, it is tied to market value. Accordingly, Mr. Weinstein's proposed bargaining splits were an unnecessary further deduction of the rate of his benchmark theory. Regardless, Mr. Weinstein's bargaining splits cannot be used to exclude the entirety of his opinion.

Mr. Weinstein's opinions regarding a bargaining split are reliable. An expert's opinion regarding how a hypothetical licensor and licensee would split the profits attributable to the patents-in-suit is admissible if it is sufficiently tied to the facts of the case. *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1334 (Fed. Cir. 2014). Here, Mr. Weinstein's bargaining split opinions

are closely tied to the facts of the case, including because "Emerging Auto would have more bargaining power than Toyota at the hypothetical negotiations" based on facts specific to this case—some of which favor Emerging Auto and some of which favor Toyota. Ex. A, ¶¶ 108-110. He further opines that the parties may "allocate to Toyota a share of the apportioned incremental profits attributable to the patents" in several different ways. *Id.*, ¶¶ 110-112.

### 1.    Mr. Weinstein's ROIC Opinion is Reliable

One way to allocate is to provide Toyota a share "equal to its return on invested capital ('ROIC')." Ex. A, ¶ 110. He used this metric because this "allocation would allow Toyota to earn a rate of return on its investment in Emerging Auto's patented technology typical for its business, even after compensating Emerging Auto for specific, quantifiable aspects of the value attributable to the claimed inventions." *Id.* He then determined at the time of the two hypothetical negotiations,

[redacted]

Mr. Weinstein's use of ROIC here is specifically tied to the facts of the case and is therefore reliable. Licensing a patent is an investment of capital by the licensee at the hypothetical negotiation to obtain use of the invention. It is rational to opine that Defendants, as hypothetical licensees, would agree to their customary rate of return when they make investments of capital in technology or otherwise. In the real world, Defendants would have sought a rate of return comparable to this rate anytime they took a license or otherwise invested capital.

This is not a "rule of thumb" or "arbitrary" methodology. The ROIC that Mr. Weinstein used is specific to Toyota at the time of the hypothetical negotiation. Therefore, analyzing Toyota's customary rate of return on invested capital at the time of the hypothetical negotiation, in addition to other facts regarding the technology and the parties' bargaining power, is not a rule of thumb (like the 25% rule) or a model untethered from the facts of the case (like Nash bargaining in certain

circumstances). In fact, Mr. Weinstein's ROIC analysis is specific to a particular defendant at a particular point in time, it is anything but an arbitrary rule of thumb. Rather, it is the examination of facts regarding what Toyota specifically would have expected to receive at the hypothetical negotiation and would have been willing to agree to when making investments of capital, like a license to technology. If anything, identifying what Toyota specifically customarily expects to receive in return when it invests in technology is the most probative evidence one could imagine regarding what percentage of profit Toyota would expect and agree to in a negotiation.

Courts routinely allow testimony like Mr. Weinstein's regarding the bargaining split that are tied to the facts of the case. *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1210-11 (Fed. Cir. 2010). This includes the use of ROIC when tied to the facts of the case:

> The Court finds that **Mr. Weinstein's use of ROIC is sufficiently tied to the facts of the case**. **ROIC is a financial calculation that fluctuates and is therefore a different figure for each defendant at any given timepoint**. This is **in contrast with "rules of thumb" like the 25% rule or the Nash bargaining theorem, which are default negotiation positions applicable to any individual negotiation**. As Plaintiffs' assert, "**[i]t is rational to opine that Defendants . . . would agree to their customary rate of return when they make investments of capital in technology** or otherwise." The **Federal Circuit has upheld profit splits based on custom in the industry and history of prior licenses, both of which seem analogous to ROIC**, which is a customary rate of return on investments. *Finjan*, 626 F.3d at 1210. There seem to be **no cases where a court struck an expert for relying on ROIC**. Ultimately, **Defendants' arguments go to the weight of Mr. Weinstein's testimony, not admissibility**.

Ex. O, *Wapp Tech Ltd. P'ship et al. v. Seattle SpinCo, Inc. et al.*, Case No. 4:18-cv-00469-ALM, Dkt. 399 at 10-11 (E.D. Tex. Feb. 8, 2021) (emphasis added) (internal citations omitted); *Nanoco Techs., Ltd. v. Samsung Elecs. Co.*, No. 2:20-CV-00038-JRG, 2022 WL 10986185, at *2 (E.D. Tex. Sept. 21, 2022) (holding that "The Court found the use of Samsung's ROIC when considered with Mr. Weinstein's *Georgia-Pacific* factor analysis and in light of the facts of this case make exclusion improper"). Based on the *Wapp Tech* and the *Nanoco* cases, Defendants' arguments go to the weight of Mr. Weinstein's testimony and not whether his methodology is reliable. Ex. O, at

10-11.

Defendants' arguments regarding exclusion fail. *First*, Mr. Weinstein's profit splits are not untethered from his *Georgia-Pacific* analysis. Indeed, Mr. Weinstein demonstrates how his *Georgia-Pacific* analysis reveals that "Emerging Auto would have more bargaining power than Toyota at the hypothetical negotiation." Ex. A, ¶¶ 108-110. This is consistent with Mr. Weinstein's proposed bargaining splits, which provide a higher allocation of the bargaining split to Emerging Auto. *Id.*, ¶¶ 108-112.

*Second*, the *Fundamental Innovation* case is not binding, and it is belied by both the *Wapp Tech.* and *Nanoco* cases—opinions from this District. As set forth above, Mr. Weinstein ties his opinions to the facts of this case, including facts regarding the date of the hypothetical negotiation and the parties' respective bargaining power, to determine ROIC is an appropriate guide, particularly given it represents Toyota's customary rate of return. Ex. O at 10-11.

*Third*, Toyota's citations to *Droplets* and *Exmark* are inapposite. In *Exmark*, the expert failed to explain how the *Georgia-Pacific* factors influenced the ultimate royalty rate, not the profit split. *Exmark Mfg. Co. v. Briggs & Stratton Power Prods. Grp.*, 879 F.3d 1332, 1349-1351 (Fed. Cir. 2018). In *Droplets*, the fundamental error with the expert's profit split analysis was that it used a 50/50 split as a starting point with no facts to support such an opinion. *Droplets, Inc. v. Yahoo! Inc.*, No. 12-CV-03733-JST, 2022 WL 2670163, at *4-6 (N.D. Cal. Jan. 12, 2022). As long as the rationale for the proposed profit split is rooted in the facts of the case, which Mr. Weinstein's is, it passes *Daubert* muster. *Finjan*, 626 F.3d at 1210.

*Fourth*, Toyota's citation to one of the *VirnetX* cases is inapposite because that involved use of the Nash Bargaining solution, which was not tied to the facts of the case. *VirnetX, Inc.*, 767 F.3d at 1331-33. Here, Mr. Weinstein's use of Defendants' ROIC—a metric that concerns

███████████████████████████████████████████████

Toyota's return on investment akin to investing in patents—is directly tied to the facts of the case.

*Fifth*, Toyota's assertion that ROIC is a "rule of thumb" methodology was flatly rejected in the *Wapp Tech* case. Ex. O, at 10-11. Moreover, there is a connection between Toyota's ROIC and the transaction at issue here—i.e., the licensing of patents—it is the rate of return Toyota normally expects when investing capital. An investment in a patent license is a capital investment for which Toyota would want to enjoy a return. Any criticisms Defendants may have with Mr. Weinstein's opinions are best left for cross-examination, not exclusion.

### 2. Mr. Weinstein's Other Bargaining Split Opinions are Reliable

<u>Revenue Share With Dealers</u>: "█████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████

Toyota's gripe that ███████████████████████████████

████████████████████████████████████ Toyota is effectively arguing that no bargaining split can ever be discerned unless the parties to the hypothetical negotiation have actually participated in a real negotiation that has all the same facts as the hypothetical negotiation. That is not the law. Here, Mr. Weinstein uses a ████████████████████

-14-

████████████████████████████████ It is hard to think of a bargaining split that could be more relevant or more tied to the facts of the case.

<u>Developer Revenue Split</u>: "Alternatively, [Mr. Weinstein opined that] the parties may allocate the apportioned incremental profits attributable to the patents based on the developer revenue split on the Apple App store and Google Play store." *Id.*, ¶ 112. ████████

████████████████████████████████████████████████████████████████

These methodologies are tied to the facts of the case. *VirnetX, Inc.*, 767 F.3d at 1334. Indeed, the revenue share with dealers is for one of ***the accused e-keys products*** (Digital Key) and represents how Toyota ████████████████████████████████████████ *Finjan*, 626 F.3d at 1210. ████████

████████████████████████████████████████████████████████████████

### III.  CONCLUSION

Defendants' motion should be denied.

-15-

Dated: April 28, 2025                                                   Respectfully submitted,

*/s/ Marc Belloli*
Marc Belloli
California Bar No. 244290
mbelloli@bdiplaw.com
M. Elizabeth Day
California Bar No. 177125
eday@bdiplaw.com
Jerry D. Tice II
Texas State Bar No. 24093263
jtice@bdiplaw.com
Aaron R. Hand
California Bar No. 245755
ahand@bdiplaw.com
Brenda Entzminger
California Bar No. 226760
bentzminger@bdiplaw.com
**BUNSOW DE MORY LLP**
701 El Camino Real
Redwood City, CA 94063
Telephone: (650) 351-7241
Facsimile: (415) 426-4744

Andrea L. Fair
Texas Bar No. 24078488
andrea@wsfirm.com
**MILLER FAIR HENRY, PLLC**
1507 Bill Owens Parkway
Longview, Texas 75604
Tel: 903-757-6400
Fax: 903-757-2323

*Attorneys for Plaintiff*
*Emerging Automotive LLC*

-17-

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on April 28, 2025, a true and correct copy of the foregoing document was served via electronic delivery to all counsel of record.

*/s/ Marc Belloli*
Marc Belloli